SCRIVEN et al. v. NORTH et al.

(Circuit Court of Appeals, Fourth Circuit. November 15, 1904.)

No. 526.

1. APPEAL—FINAL DECISION—DECREE IN PART FINAL AND IN PART INTERLOCUTORY.

Where a bill in a Circuit Court set up four distinct causes of action, one for infringement of a patent, one for infringement of a trade-mark, and two for unfair competition, a decree dismissing the bill as to the first three causes of action is a "final decision" thereon, in such sense as to be appealable, although as to the fourth cause of action the bill is sustained and an accounting is directed thereunder.

[Ed. Note.—Finality of judgment for purpose of review, see notes to Central Trust Co. v. Madden, 17 C. C. A. 238, and Prescott & A. C. Ry. Co. v. Atchison, T. & S. F. R. Co., 28 C. C. A. 482.]

2. UNFAIR COMPETITION—IMITATION OF DRESS—INTENT TO DECEIVE.

Complainants established the manufacture of a peculiar style of men's drawers, having a strip of elastic knitted material inserted at the seams. The body of the garment was white, and the seam strips made of Egyptian yarn, the natural color of which is yellow or buff, and which was selected deliberately and because of its distinctive color. Complainants also adopted the name "Scriven's Elastic Seam," and the arbitrary number "50," which were stamped upon each garment. Thirteen years or more later, and after complainants' garment had become well known by reason of such distinctive features, and had acquired a high reputation and large sale on its merits, defendants began the manufacture and sale of an inferior and cheaper garment, but having the same general appearance. They were stamped with the words "Standard Stretchy Seam" and the same numeral, "50," in a style imitating that of complainants. When complainants changed the form of their stamp, defendants changed theirs to correspond. They also advertised their goods as "Elastic Seam Drawers." In some cases defendants also used a cheaper domestic yarn in making the seam strips, dyed to imitate the Egyptian yarn used by complainants. Held that, aside from any question of trade-mark or of defendants' right to make and sell their goods without resorting to deception, such facts showed a deliberate intention to deceive purchasers by palming off their goods as those of complainants, which constituted unfair competition, and entitled complainants to an injunction; it being further shown that purchasers were in fact deceived, and that defendants' goods were largely advertised and sold by dealers as "Scriven's."

[Ed. Note.—Unfair competition, see notes to Scheuer v. Mueller, 20 C. C. A. 163, and Lare v. Harper & Bros., 30 C. C. A. 376.]

3. SAME—GROUNDS FOR RELIEF.

The general principle that no man has a right to pass off his goods as and for the goods of another is broader than the rules applicable to

strict trade-mark, and extends to all cases of unfair competition; the difference between cases for infringement of trade-mark and those for relief against unfair competition being mainly in the matter of proof, the imitation of a trade-mark raising a conclusion presumptive of fraud, while in cases of unfair competition actual fraud or misleading of the public, or conduct calculated and intended to mislead it, must be shown by the proofs.

4. PATENTS—INFRINGEMENT—UNDERGARMENTS.
  The Scriven patents, No. 378,465 and No. 472,555, each for improvements in undergarments, construed, and *held* not infringed.

Appeal from the Circuit Court of the United States for the District of Maryland.

For opinion below, see 124 Fed. 894.

Arthur v. Briesen (Edwd. N. Rich and Henry M. Turk, on the brief), for appellants.

Edgar H. Gans and W. Calvin Chesnut, for appellees.

Before GOFF, Circuit Judge, and BRAWLEY and PURNELL, District Judges.

BRAWLEY, District Judge. The bill of complaint charged the defendants with the infringement of two patents for certain improvements in undergarments, and asked for an injunction and an accounting. It also charged the infringement of certain trade-marks or trade-names, and asked an injunction restraining the same and damages resulting therefrom. It charged, also, unfair competition in trade in making and stamping the garments in question, alleged to be infringements of the patents. It charged, also, unfair competition in trade in using a box of peculiar style.

The decree of the court below was: (1) That the defendants had not infringed the letters patent, or either of them, and directed that the bill, in so far as it relates to each and both, be dismissed. (2) That complainants had no valid trade-mark, and that defendants had not infringed any rights of complainants in so far as related to the alleged trade-mark, and directed that the bill be dismissed. (3) That defendants had not infringed or violated any rights of complainants in the manufacture of the garments mentioned, and directed that the bill be dismissed in so far as it sought to enjoin or in any wise interfere with the manufacture and sale of said garments by the defendants. (4) It held that the defendants had put up and offered for sale the drawers made by them in boxes made in imitation of those adopted by the complainants; that the imitation was intentional and for the purpose of unfair competition, to enable the defendants' goods to be deceptively substituted for complainants' goods; and therefore enjoined and restrained the defendants from selling their garments in boxes resembling or imitating complainants' boxes, and decreed that the complainants recover the damages which defendants had caused by their unlawful and unfair competition, and referred it to a master to take an account of defendants' said profits and to make an assessment of damages sustained by complainants by reason of such unlawful and unfair competition in trade—the decree closing in these words:

"The matter of costs is reserved for final consideration by the court on the coming in of the master's report and the final decree."

The complainants appeal from all of that part of the decree which orders the bill of complaint to be dismissed, and we are met on the threshold by a motion to dismiss the appeal on the ground that the decree was not a final decree. The act establishing this court provides that it shall "exercise appellate jurisdiction to review final decisions in Circuit Courts." It has been held that the phrase "final decisions" is equivalent to the words "final judgments and decrees" in the act governing appeals to the Supreme Court. Act Feb. 18, 1895, c. 96, 28 Stat. 666, amended the original act, so as to allow appeals in certain cases from interlocutory decrees, where an injunction shall be granted, continued, refused, or dissolved; but by act June 6, 1900, c. 803, 31 Stat. 660 [U. S. Comp. St. 1901, p. 550], section 7 of the act of March 3, 1891 (26 Stat. 828, c. 517), was amended by omitting the provisions for appeals in cases where an injunction is refused or dissolved, restoring the original phraseology, without mentioning Act Feb. 18, 1895. As our jurisdiction is not invoked under the last-mentioned act, we assume that it is conceded that Act June 6, 1900, repeals by implication this amendment, and that an appeal does not lie from an interlocutory decree denying an injunction. We have, then, to determine whether the decree appealed from is a final decree.

By its terms it is not, because the court reserves the question of costs for the coming in of the master's report and the final decree; but whether it is appealable is a question which must be determined by this court upon a consideration of what was done by the lower court in essence, and not by the name given to it. The complainants had four separate and distinct causes of action: (1) Infringement of patents; (2) infringement of trade-marks; (3) unfair competition in the manufacture and sale of undergarments; (4) unfair competition as to the use of the box. As to the three first mentioned, the decree in its essence and in terms is final. The injunction prayed for is refused, and the bill is dismissed. As to the fourth cause of action, the bill is retained and an account ordered to be taken. Each is a severable matter from the other subjects of controversy, and the accounting as to the unfair competition in the matter of the boxes does not affect the finality of the decree as to the three other distinct and separate causes of action.

The general rule as to what constitutes a final decree is well settled. It must so far terminate the litigation between the parties on the merits that in case of affirmance nothing would remain to be done but to execute the judgment or decree; and the reason for the rule is that thereby a multiplicity of appeals in the same case is prevented, and the case will not be heard by piecemeal. There are some exceptions to this rule, among the earliest of which is Forgay v. Conrad, 6 How. 201, 12 L. Ed. 404, which is generally treated as exceptional. The object of the bill in that case was to set aside sundry deeds for lands and slaves, and for an account. The court declared the deeds to be fraudulent and void, directed the property to be delivered up to complainant, and that the master take an account of the profits. It was held that the decree was appealable, although Chief Justice Taney said: "Undoubtedly it is not final in the strict technical sense of that term."

The opinion in that case went largely upon the ground that the decree not only decided the title to the property in dispute, but awarded execution. The reason for the exception seems to exist here. The complainants assert property in certain patents. That property is the exclusive right to use it and for a limited period, and the decree dismissing the complaint annuls the patents and deprives complainants of their rights in the patents, and in the trade-marks, which they claim as property. That loss may be irreparable, for a material part of that period during which they may be entitled to exclusive use is gone and cannot be regained.

There is another consideration proper to be taken, and that is that if the appeal is delayed until the coming in of the master's report as to the boxes, and this court should decide that the complainant was entitled to the other relief asked for, there would have to be a new accounting, while if the court grants the relief now the master can proceed with it coincidently with that already ordered. Upon the whole, we have determined not to dismiss the appeal.

The testimony shows that in the year 1884 Jeremiah A. Scriven, manufacturer of underwear, began the manufacture of a new style of men's drawers, the body portion of which was of white jeans, with longitudinal insertions of elastic knitted fabric inside and outside of the legs and at the back. Until that times drawers were all made of a uniform color, and in order to make his garments distinctive Scriven had the body portion of his garments made white and the elastic insertions yellow or buff. The selection of this buff color was deliberate and for the purpose of making it conspicuous and different from other similar garments. He gave these drawers the name of "Elastic Seam," and the distinguishing number, "50," both the words and the number being stamped upon the drawers. These drawers were first manufactured under Brown's patent of 1881, of which Scriven seems to have become the owner about that time. Subsequently Scriven obtained letters patent Nos. 378,465, February 28, 1888, and 472,555, April 12, 1892. The business which was established by him in 1884 was continued by a firm of which he was a partner until 1891, when the complainant corporation, of which Scriven is president, was formed and took over the business, and the two patents in suit were transferred to the corporation. The business was successful, and the uniformity and excellence of the product, which came to be known and sold as the "Scriven Drawers," gave them a valuable reputation in the market, and the trade in them reached large proportions, extending throughout the United States. At the expiration of the Brown patent in the autumn of 1898, the defendants and a number of manufacturers began to manufacture and to put upon the market a type of drawers similar to Scriven's. The drawers manufactured by the defendants are inferior in quality to Scriven's and were sold much cheaper. Before the alleged infringement began Scriven's elastic seam drawers sold at $8.50 a dozen. The defendants' No. 50 drawers were sold at $3.75 a dozen, and their No. 57 at $4.25 a dozen, to jobbers. The bill of complaint was filed March 26, 1901, and charged infringement of patents, infringement of trade-marks, and unfair competition.

We will consider the question of trade-marks and of unfair competition together, for they both rest upon the same principle, which is that no man has a right to pass off his goods upon the public as and for the goods of another, or, as Mr. Justice Strong says, in Canal Company v. Clark, 13 Wall. 311, 20 L. Ed. 581, considering a trade-mark case:

"The essence of the wrong consists in the sale of the goods of one manufacturer or vendor as those of another."

The defendant North testifies that under professional advice, as the Brown patent of June, 1881, had expired by limitation, he commenced in 1899 the manufacture of "what is now known as our Garland No. 57 jean drawer. This drawer is the exact counterpart of Mr. Scriven's No. 50 drawer"; and again he says:

"When I commenced the manufacture of Garland No. 57 drawer I sent out for a pair of Scriven's drawers and made the Garland No. 57 in every particular like theirs, with the exception that I put pearl buttons on the Garland No. 57, and the laced back, and sewed down the piece in the crochet so as to make a reinforce out of it. I also stamped the drawer with an oval stamp, at first in black ink, and subsequently in blue ink. The following year (1900) I introduced the 'Standard Stretchy Seam Drawer' to the trade, and cheapened it, in order that the garment might be sold for 50 cents retail. I cut this garment with the one seam stomacher, single stitching seam, put on pearl buttons and laced back, and stamped it in blue ink. I had the Scriven drawer before me at the time, and endeavored not to conflict in any way with their 'Elastic Seam Drawer No. 50.' This drawer as manufactured was not intended to be put in competition with theirs."

The "Standard Stretchy Seam Drawer No. 50" was put on the market and sold as "No. 50" until, after the commencement of this suit, under advice of counsel, they dropped that number. Several trade journals have been offered in evidence, wherein it appears that North Bros. & Strauss, under the heading, printed conspicuously, of "Elastic Seam Drawer," announced to the trade that they have "decided to place on the market a new elastic seam jean drawer, to be known as the 'Standard Stretchy Seam Drawer, Lot No. 50.'" The testimony also shows that the defendants' drawers have elastic insertions, arranged like the Scriven drawers and of the same color, buff or yellow. This elastic insertion in Scriven's drawers was made of Egyptian yarn, the natural color of which was buff. The defendant North testifies that at the time he was being examined they were using some domestic yarns dyed to imitate the Egyptian yarns; that he did not know the yarn was dyed until lately, his attention being called to it, owing to its cheapness; that it is a good imitation, but it does not answer the purpose which the Egyptian yarns do, on account of the fact that in stretching the anklets it takes all the elasticity out of them.

The designation, "No. 50," of Scriven's drawers, is merely an arbitrary one. It does not indicate anything as to the size of the drawers, but in the trade it had come to signify Scriven's standard elastic seam drawers, so that a purchaser could identify it by that number. The testimony is abundant that at the time of the commencement of this suit complainants' drawers had attained a high reputation; that they were distinguished from all other drawers then upon the market by the buff color insertion in the legs, which color had been especially selected for the purpose of so distinguishing them; that they were marked with an

oval stamp, "Scriven's Elastic Seam," in a semicircle, with three straight printed lines below and the number, "50." A copy of the stamp and a copy of the defendants' stamp will show that the defendants used a stamp, "Standard Stretchy Seam," printed in a semicircle, with three straight printed lines and the number, "50," below; the stamps closely resembling each other in shape, in the like number of straight lines, and in the numeral, as will appear by inspection.

When Scriven's drawers were first put in the market, the words were stamped in straight lines. The defendants also marked their drawers in straight lines, and when the complainants adopted the oval stamp the defendants followed with a similar oval stamp. It thus appears that complainants' drawers had certain distinctive marks and indicia: First, in the buff-colored insertions in the legs, which made them unique in appearance, for before they began the manufacture nothing of the kind was known in the market; second, by the adoption of the name "Elastic Seam," which words the court below held to "precisely describe and express the peculiarity of the complainants' garment." We are not clear that this phrase is precisely descriptive, for in point of fact a seam is nothing more than a line of stitches, and is not and cannot be elastic. It was the buff-colored insertion that was elastic. However that may be, the proof seems to show clearly that the words "Elastic Seam," which we incline to believe is a fanciful designation, was identified with the complainants' goods. Whether in fact it avoids being a technical trade-mark, because it is a description of the goods, it was adopted by the complainants to describe their goods. It was a phrase not used before for such purpose, and did, in fact, so identify complainants' drawers as to be known to the trade as indicating the complainants'

product, and was so generally recognized. The numeral, "50," was also adopted by the complainants, not as descriptive of the size of the drawers, but as one of the distinguishing characteristics of their standard elastic seam drawers, and so became associated in the public mind with their goods.

We do not find that there was anything of a peculiar nature in the oval stamp adopted by the complainants, as the proof shows, and it is a matter of common knowledge that stamps of that shape are in common use; but it is not without significance that, with the wide field of choice before them, the defendants should first have adopted a straight stamp, and afterwards, when complainants began to use an oval stamp, should have followed them by adopting a stamp of like shape, with lettering and lines so arranged as would be likely to mislead the careless observer. The use of the words "Stretchy Seam" by the defendants is intended to convey to the mind of the purchaser precisely the same idea as is conveyed by the words "Elastic Seam," and, while descriptive words are not subject to an exclusive appropriation, we are of opinion that defendants adopted and applied the name "Stretchy Seam" to their garments for the purpose of imitating the name which had been adopted by the complainants. In their advertisements and otherwise they have endeavored to convey the impression that the two names are synonymous. Their own trade-mark was the word "Garland," and they certainly did not adopt the words "Stretchy Seam" for the purpose of individualizing their own garments. They advertised them to the trade as elastic seam drawers, and if they did not stamp them in that name it was most probably due to an apprehension that "Elastic Seam" was a valid trade-mark, and, if so, they hoped to escape infringement by the use of the words "Stretchy Seam." So, the stamping of the numeral, "50," on their stretchy seam drawers in precisely the same place where the same numeral appears on the stamp of the complainants, seems to us to indicate an intention to so stamp their drawers as to make them as nearly alike as possible to the complainants'; and the putting of the words "perfect made drawer" in three straight lines indicates a like intention to imitate the three straight lines appearing in the same place on the complainants' stamp. Certainly "perfect made drawer" could not be intended to mean that they were in fact perfect, for the testimony shows that the drawers so stamped were inferior in quality and make, not only to the "Elastic Seam Drawer No. 50" of the complainants, but to their own "Garland No. 57."

Upon the whole, we cannot resist the conclusion that the defendants have manufactured the drawers of an inferior quality to the complainants', and have so stamped them as to deceive the unwary, and thus mislead the public into purchasing such inferior goods in the belief that they were of the complainants' manufacture; and this seems to have been the conclusion of the learned judge below, who says:

"There is evidence that confusion has arisen very detrimental to the complainants' business and reputation. The complainants have established a reputation for producing a high grade of goods, and have built up an extensive and valuable good will, and the defendants can have but one purpose in dressing the goods of their manufacture to look so precisely like the complainants', and that is to deceptively induce buyers to take an article which looks like the manufacture of the complainants, but which is made by the

defendants. The defendants make their drawers of white jean and select a buff-colored insertion, which causes them to look precisely like complainants', and they imprint on the waistband a stamp which at a careless glance is not at once distinguishable from complainants'."

If the defendants have used habitually for their elastic insertion an inferior quality of American yarn dyed a buff color to imitate the natural color of the superior quality of Egyptian yarn used by the complainants, the intention to deceptively imitate complainants' product would be conclusively established. We do not think that it would be proper to forbid by injunction the use of a like color of insertion, if that was the natural color of the material used, as appears to be the case with the Egyptian yarn; but the use of an inferior material, dyed to imitate the color adopted by complainants, ought clearly to be forbidden, for this color was originally selected by complainants for the purpose of distinguishing their goods, and the use of inferior material dyed to imitate it could have no other purpose than to deceive, and would be calculated to mislead, the public, accustomed to the distinctive characteristics of the complainants' garment, into buying an inferior article.

The defendants, if they wish to sell their goods on their own merits, have a wide field of selection, and, if they use dyed insertion, may dye them red, or blue, or black, as they may choose. They may make and sell cheaper garments than complainants', for cheapness, notwithstanding some pronouncements against it lately from high political quarters, is not yet an offense denounced by legal penalties; but no person has the right to make or sell a cheap and inferior article, dressed in the guise of a superior article made by another, and so deceptively palm it off. This is an injury both to the honest manufacturer and to the public. The courts of justice would not be worthy of the name if all their lawful powers could not be invoked to prevent it, and we think that the learned judge below erred in holding, as he did, that he was without power; for, following the language from his opinion above quoted, he says:

"There are imitations, no matter with what motive done, the court cannot enjoin, because, if the complainant has no patent which is infringed, any one may copy the complainants' make of drawers, and the stamp imprinted is one in common use, and, when examined, is different."

He seemed to lose sight for the moment of the doctrine of unfair competition, which, as we will see later, is as well established as the law of patents, or of trade-marks, and he himself has invoked it in the matter of the boxes, for he says in the opinion:

"The shape, color, and lettering of the boxes in no way results from the manufacture, but is an intentional imitation of the style of putting up complainants' goods, by which they have come to be known in the trade, and which must have been designedly adopted by the defendants for the deceptive purpose of misleading as to the origin of the goods, and of causing their goods to be deceptively substituted for the complainants'."

The question of the boxes is not before us on appeal, and it would be unfair to defendants to raise any implication that they are content with this finding because they have not appealed from the decree restraining the use of the boxes, for they may, and, doubtless, do, prefer to wait a final decree on that point; but we cannot ignore such a finding of fact, for, if correctly found, it throws a flood of light upon the other

acts of the defendants, the testimony regarding which tends to show a like deceptive and misleading purpose, and these now remain to be considered.

Outside of the inferences to be drawn from the similitude in the stamp, name, and number, and which we have already considered as leading to the conclusion that there was a deceptive purpose in adopting them, there is little direct testimony connecting the defendants or their authorized agents with any positive acts. In the nature of things this would be so, for persons about to engage in unlawful or questionable undertakings are not likely to proclaim their purposes on the housetops; but there is some testimony which tends to show that the defendants directly, through their authorized agent, endeavored to market their goods under the guise of the complainants', and that is the testimony of Anderson, who was the manager of their New York branch for several years prior to January 1, 1902. He says that he kept a sample of the Scriven drawer on the counter in the New York office; that when customers came in and asked for an elastic seam drawer he would sell them defendants'; if they asked for "the Scriven drawer," he would show them defendants' and sell it; and so if they asked for a No. 50. The following questions and answers illustrates the method:

"Then you made a difference between 'a' Scriven drawer and 'the' Scriven drawer, is that it? A. Yes; when a man asked for a Scriven drawer, I knew that he wanted the side seam drawer, and I showed him ours. Q. And sold him yours? A. Yes, sir."

And in another answer, he says:

"We had a sample of the Scriven drawer on our counter, and I have said that it was made the same as Scriven's drawer, with the exception of the crotch piece in the seat."

The inference seems to be clear that this sample of Scriven's drawers was kept, not for the purpose of showing the difference between the two, but to show the absolute identity between them, so that purchasers, mainly jobbers, who bought to sell again, could see that the defendants' were such an imitation of the Scriven drawers that they could easily be sold again as genuine Scriven. What might readily be expected to happen from the putting on the market of such cheaper imitation, the testimony abundantly proves actually did happen. The proofs show that in Denver defendants' drawers were displayed in the show window, with the sign on them reading, "Scriven's Elastic Seam Drawers." Like garments were shown in Topeka, with the sign reading "Scriven's Drawers." In Omaha the plaintiffs' traveling agent bought and had billed to him the defendants' drawers as Scriven's. The same witness bought like goods in Sedalia, Mo., as "Scriven's Elastic Seam Drawers," In Danville, Va., a haberdasher advertised in the newspaper there "Scriven's Elastic Seam Drawers, full-bleached, sold everywhere at 85 cents, here in all styles this week at 59 cents," and exhibited in his show window a card, which read, "75 cts. Scriven drawers, as advertised, 59 cts.," and sold defendants' drawers at that price. In New York, Charles Broadway Rouss, a large wholesale dealer, advertised drawers "same as Scriven's," the cuts for this advertisement being supplied by the defendants. A number of other cases appear in the record where defendants' goods were advertised and offered as Scriven's. The tes-

timony does not show any connection of defendants with these misleading advertisements. There is some testimony as to statements made by one of their traveling salesmen, implicating the defendants, but the testimony of that witness has been discredited. The testimony is abundant that the goods of defendants were sold as Scriven's, and there is sufficient resemblance in make and marks as to make that deception easy and practicable, and we do not think it is a sufficient answer to say that there are differences which a careful examination would disclose, or that the retailer to whom the manufacturer sells is not himself deceived, if the goods are put up in such a way and marked in such a way that the ultimate purchaser could be deceived into buying them as Scriven's goods, or that the manufacturer should not be held to liability because the shopkeeper to whom he sells practices a fraud upon his customers.

The question as to the measure of such liability and the extent of it might arise upon an accounting, but if he knowingly puts it in the power of the shopkeeper so to deceive he should be enjoined. The power of the courts is not usually invoked for the protection of the strong and shrewd, who commonly can take care of themselves. It is the ignorant and the unwary that generally demand their protection, and courts will be without power to afford a remedy in most cases if their right to grant relief was limited to those cases where the immediate customers were deceived. A stamp with the words printed in straight lines would identify the defendants' goods as easily as the oval stamp. Granted that the oval form is in common use, the straight is equally common, and was, in fact, used formerly by defendants and complainants alike; and when the proof shows, as it does, that after the complainants adopted the oval form the defendants adopted a stamp resembling it, when they show no good reason for such change, or any reason at all, except that, being a common form, they had the right to use it as well as complainants, and when we find, as we do, that there is a resemblance between the two, and no reason appears for such resemblance, except that it was calculated to deceive, we must conclude that it was adopted for that purpose.

We will now consider some of the cases which we think establish the principle which should govern and sustain the conclusion which we have reached. Some of them are trade-mark cases, and there seems to be a tendency in this country to limit the field of technical trademarks, and to extend the field of unfair competition; but the principle is the same in both, the differences being mainly matter of proof. There are certain elements of property right in a technical trade-mark, and the use by one dealer of a sign, symbol, or word which constitutes the trade-mark of another raises the conclusive presumption of fraud, and proof of actual intention to injure is dispensed with, and injunction goes as of course; while in cases of unfair competition, which rest upon a somewhat broader principle than technical trade-marks, actual fraud or misleading of the public, or conduct calculated to mislead it, must be shown by the proofs, either of actual intention to do the wrongful act, or of the adoption of means calculated to effect that result. It becomes, therefore, largely a question of fact, and is far more complicated than a question of trade-marks simply. The foundation prin-

ciple is the same, and that is that no manufacturer or trader should be allowed to dress up his goods in such a style and form, and by the use of such names and marks, or colorable imitations thereof, as are calculated to mislead the public, induce purchasers into buying his goods as for the goods of another, who, by the adoption of certain distinctive marks and indicia, and by a long course of fair dealing, has made the public familiar with his goods and trustful as to their quality. Courts cannot forbid the use of words, which, standing alone and in their ordinary signification, are common property, or of numerals, which all the world is free to use, or of labels and stamps of common form, in which no one can claim an exclusive use, even though it may be shown that careless persons may in some instances be misled; but if they are so collocated and stamped upon an article in manifest imitation of a form previously adopted by another as a means of distinguishing his goods, with the deceptive purpose to mislead, disguising one's own goods thereby, and inducing the public to believe that they are the goods of another, such conduct falls under the ban.

The general principle that no man has a right to pass off his goods as and for the goods of another is broader than the rules applicable to strict trade-mark. In this country this principle is generally designated as "unfair competition in business." One of the earliest English cases where relief was granted against unfair competition was that of Knott v. Morgan, 2 Keen, 213, where the plaintiff had been doing business under the name of the "London Conveyance Company," and the defendants began to run omnibuses painted like those of plaintiff and with servants clothed in similar style. There was no question of trade-mark, but the defendant was enjoined, the court saying:

"It is not to be said that plaintiffs have any exclusive right to the words, 'Conveyance Company' or 'London Conveyance Company,' or any other word; but they have a right to call upon this court to restrain the defendant from fraudulently using precisely the same words and devices which they have taken for the purpose of distinguishing their property, and thereby depriving them of the fair profits of their business, while attracting custom on the false representation that carriages, really the defendants', belong to and are under the management of the plaintiffs."

In Croft v. Day, 7 Beav. 84, the defendant was a nephew of the elder Day, who had originated the famous blacking, known as "Day & Martin's." He dressed his goods in the same style, and, while the court held that he had a right to use his own name on his boxes of blacking, it granted an injunction, saying:

"The accusation which has been made against the defendant is this: that he is selling goods under forms and symbols of such a nature and character as will induce the public to believe that he is selling goods which are manufactured by the manufactory which belongs to the testator in this cause. It has been very correctly said that the principle in these cases is this: that no man has a right to sell his own goods as the goods of another. You may express the same principle in a different form, and say that no man has the right to dress himself in colors or to adopt the bare symbols to which he had no peculiar or exclusive right, and thereby personate another person, for the purpose of inducing the public to suppose either that he is that person, or that he is connected with and selling the manufacture of such other person, while he is really selling his own. It is perfectly manifest that to do these things is to commit a fraud, and a very gross fraud. It is, of course, conceded that the defendant had the right to use his own name on his boxes of blacking."

In Wotherspoon v. Currie, L. R. 5 H. L. 508, the plaintiff had purchased the business and trade-mark of a firm which had manufactured starch at Glennfield, in Scotland, which was labeled and widely known as "Glennfield Starch," and had removed the works to Paisley. The defendant, who had previously done business at Paisley, began manufacturing starch at Glennfield, and selling it as "Glennfield Starch." This was held to be unlawful by the House of Lords, on the ground that the word "Glennfield" had become detached from its original geographical meaning and acquired a secondary signification in connection with the starch, so as to mean starch made by the plaintiff, and the latter had thereby acquired an exclusive property in the word. Some of the judges apparently held that, as the defendant was guilty of an actual fraudulent intent, he should be enjoined, irrespective of the existence of a trade-mark.

So, in Montgomery v. Thompson [1891] App. Cas. 217, the plaintiffs and their predecessors had carried on a brewery at Stone, in Staffordshire, for more than a hundred years, and their ales were known as "Stone Ales." The defendant, living in Liverpool, established a brewery in Stone. It was held that plaintiffs had no trade-mark in the words "Stone Ales," yet defendants were enjoined from selling their ales as "Stone Ales"; Lord Justice Lindley saying that, although plaintiffs had no exclusive right to the words "Stone Ales," or any right to prevent defendant from selling his goods as having been made at Stone, yet—

"As against the particular defendant, who is fraudulently using or going to fraudulently use the words, with the express purpose of passing off his goods as the goods of the plaintiffs, it appears to me that the plaintiffs may have rights which they may not have against other traders. The evidence in this case convinces me that any ale which may be sold by this particular defendant as 'Stone Ale' may be intended by him to be passed off as plaintiff's ale."

Lord Hannon said in the House of Lords:

"The appellant is undoubtedly entitled to brew ale at Stone, and to indicate that it was manufactured there; but there are various means of stating that fact without using the name which has now become a designation of the respondent's ale."

One of the most important cases, frequently cited, is that known as the "Camel Hair Case," Redeaway v. Banham, from the House of Lords, 1896. In that case Redeaway manufactured a kind of belting, which became popular, and was advertised and sold as "Camel Hair Belting." This was made from a yarn similar to that used in the manufacture of carpets. The defendant, who had been an employé of Redeaway, began making similar belting, which he at first called "Arabian Belting," and after his business was sold to a limited company they began advertising their goods as "Camel Hair Belting," stamping the words upon the goods, without any distinguishing words or marks, and without putting the company's name on it. The case was tried by a jury, which found that in the trade "Camel Hair Belting" meant Redeaway's belting, as distinguished from others, and that defendants so described their belting as to be likely to mislead purchasers into buying it for that made by the plaintiffs and that defendants in fact endeavored to pass off their goods for those of the plaintiffs. At the time

when the plaintiffs had begun their manufacture, it was not known that the material composing it was, in fact, camel hair. It was believed to be a mixture of the hair of sheep, goats, and other Eastern animals; but it was proved that the material was, in fact, the hair of the camel. An injunction was granted, but the same was reversed by the Court of Appeals, on the ground that, as "camel's hair" accurately described defendants' goods, they could not be prevented from using the term. This decision was reversed in the House of Lords, on the ground that in the trade "Camel Hair Belting" meant Redeaway's belting. It appeared at the trial that for about 14 years no belting had been sold under that name except Redeaway's. It was supposed originally that the term "Camel Hair" was a fanciful one, and the counsel for the defendants contended that, as the expression "Camel Hair Belting" was the simple truth and described the material of which their goods were composed, they could not be held liable for mistakes that the public might make; but it was held that the whole merit of the description for the defendants' purposes lay in its duplicity, that it found a market because it was supposed to be Redeaway's belting, and Lord Macnagton said:

"I venture to think that a statement which is literally true, but which is intended to convey a false impression, has something of a faulty ring about it. It is not sterling coin. It has no right to the genuine stamp and impress of truth."

Lord Morris said that he had some difficulty in concurring in the judgment, for it established, in his opinion, for the first time, the proposition that a trader is not permitted to merely tell truthfully and accurately the material of which his goods are made; but he felt bound by the finding of the jury, which amounted to holding that "Camel Hair Belting" had become so identified with the name of the appellant, Redeaway, as that "Camel Hair Belting" had in the market attained the meaning of Redeaway's belting. Said he:

"That finding establishes as a fact that use of the words 'Camel Hair Belting,' simpliciter, deceives purchasers, and it becomes necessary for the respondents to remove that false impression so made on the public; that something which to my mind is obviously done when the respondents put prominently and in a conspicuous place on the article a statement that it was 'Camel Hair Belting,' manufactured by themselves. Having done so, they would, as it appears to me, fully apprise the purchasers that it was not Redeaway's make by stating that it was their own make."

The Glennfield Case and the Stone Ale Case were cited with approval by the Supreme Court of the United States in Lawrence Mfg. Co. v. Tenn. Mfg. Co., 138 U. S. 537, 11 Sup. Ct. 396, 34 L. Ed. 997, and the cases establishing the same doctrine in this country are so numerous that it would unduly expand this opinion if all of them were referred to. Many of them are collocated in the note to Scheuer v. Muller, 20 C. C. A. 163, and the note to Blake Lare v. Harper & Bros., 30 C. C. A. 376. Among those that may be profitably consulted are Putnam Nail Co. v. Bennett et al. (C. C.) 43 Fed. 800; Pillsbury v. Pillsbury-Washburn Co., 64 Fed. 841, 12 C. C. A. 432; Dennison Mfg. Co. v. Thomas Mfg. Co. (C. C.) 94 Fed. 651; Fuller v. Huff, 104 Fed. 141, 43 C. C. A. 453, 51 L. R. A. 332; Sterling Remedy Co. v. Spermine Medical Co., 112 Fed. 1000, 50 C. C. A. 657; Enterprise Mfg. Co. v. Landers, Frary & Clark (C. C.) 124 Fed. 923; Coates v. Thread Co., 149 U. S.

562, 13 Sup. Ct. 966, 37 L. Ed. 847; Singer Mfg. Co. v. June Mfg. Co., 163 U. S. 169, 16 Sup. Ct. 1002, 41 L. Ed. 118. These cases all illustrate the fundamental principle that no man may be permitted to sell his goods as and for the goods of another, and, if strict trademark rules are inadequate to enforce this principle, the courts will resort to the broader rules relating to unfair competition, and, as summed up by the Supreme Court in the Coates Thread Case, this rule is:

"Rival manufacturers may lawfully compete for the patronage of the public in the quality and price of their goods, in the beauty and tastefulness of their inclosing packages, in the extent of their advertising, and in the employment of agents; but they have no right, by imitative devices, to beguile the public into buying their wares under the impression they are buying those of their rivals."

It is to be remembered that a purchaser of an article of general use, which in the course of years has come to be known as of superior quality, and recognized by certain catchwords and certain visible marks, may be easily deceived into buying articles of inferior quality, designated by words of similar signification and superficially resembling the genuine; for he does not usually have the opportunity of seeing the genuine and the imitation side by side. He commonly has in mind only the characteristic features in the designation and appearance of the article he wishes to buy, and is exposed to imposition if the imitation, though slight, is of those salient features, and thus the reputation and good will established by years of advertising and production of articles of superior quality would be frittered away, if inferior goods, sufficiently resembling the genuine to be mistaken for them, are put on the market and readily sold as and for the genuine. The imitation goods may not be identical in any one feature, but, if similar in all and designated by similar marks and similar catchwords, the sale should be enjoined, or the imitation permitted only under such limitations as will prevent misapprehension on the question of its real character, and so differentiated that the public will not be imposed on or the complainant defrauded.

We concur in the conclusions of the court below that there has been no infringement of the patents in controversy, and adopt as our opinion so much of the opinion as relates thereto. It is as follows:

"In 1885 the firm of J. A. Scriven & Co. began putting upon the market a special make of drawers, the body portion of which is of white jean, and along the seams on the inside and outside of the legs, and along the seam at the back of the upper portion, there were longitudinal insertions of buff-colored elastic knitted fabric, joining together the portions made of white jean. These garments were made after the method of the United States patent to C. A. Brown, No. 243,498, June 28, 1881 (now expired), of which patent Jeremiah A. Scriven was the owner, and they were so stamped. The specifications of that patent described an undershirt and drawers made of a woven material with gores or gussets of an elastic knitted fabric inserted at places where it was desirable to give the garment greater elasticity, and the claim was for the combination of the woven body fabric and the knitted insertions. The garments put upon the market by the complainants were called 'Scriven's Patent,' 'Elastic Seam 50,' and 'Scriven's Elastic Seam Drawer 50,' and since 1892 have been put up in white paper boxes, with gilt edges, of the form known as a 'telescope box,' and had and continue to have printed in blue ink, in large script letters, on its front side and also on its top, 'Scriven's Patent Elastic Seam Drawer,' and the number '50,' and an

illustration of a pair of drawers. The drawers originally sold by the complainants, and which as to the elastic seam are similar to those made by both the complainants and defendants, were marked by a stamp on the waistband as being made under the patent of 1881; those made since 1892 are stamped 'Scriven's Elastic Seam, patented Feby. 28, 1888; April 12, 1892, 50.' The patents alleged by the bill of complaint to have been infringed are the two patents last above mentioned.

"Patent No. 378,465, February 28, 1888, was granted to the complainant Jeremiah A. Scriven for an improvement on the kind of undergarment described in the expired Brown patent, No. 243,498, June 28, 1881, which was composed of a woven body with knitted insertions. This patent is for a similar undergarment made of two different kinds of knitted fabric. The insertions are, as in Brown's patent, of a knitted fabric, but differing from Brown's patent. The body was also of a knitted fabric, longitudinally elastic, but less laterally elastic than the insertions. The claim is for the garment made of a knitted body longitudinally elastic, with laterally and longitudinally elastic knitted insertions, the insertions to be more elastic than the body. The sole novelty of this combination was the use for the 'body material of a knitted fabric, instead of a woven material, as appears both from the specifications and claim, and by the file wrapper and contents; and this is all that differentiates it from the expired Brown patent of 1881. As the material of which the body of defendants' garment is made is the woven jean of the Brown patent, I find there is no infringement of the patent of 1888.

"It is urged by the complainant that in the Brown patent the insertions are shown only as gores and gussets at certain points in the drawer, and not as a continuous insertion along the whole length of the seams. Observing the drawing which illustrates the Brown patent and shows this invention, it would be difficult to hold that it required invention to extend the insertions until they should be continuous. The construction that complainants put on the Brown patent is evidenced by their making drawers similar to those now made by them, and marking them as made under that patent. If the continuous insertion was not covered by the Brown patent, then it is not covered by any patent, for it is not claimed or indicated as an invention in any subsequent patent put in evidence.

"The other patent, in respect to which the bill of complaint charges infringement, is No. 472,555, April 12, 1892, to Jeremiah A. Scriven, for an improvement on the articles of underwear described in the above-mentioned patent, No. 378,465, of February 28, 1888. The improvement claimed is intended to be applied to drawers. The insertion for the inside of the legs is made continuous across the crotch, and the insertion at the back is also continued at right angles across the crotch, and the novelty consists in not sewing down the overlying piece of insertion to the underlying piece. By leaving the upper piece unattached at its edges to the under piece, it is claimed that the requisite strength is obtained at the crotch, while the desired elasticity is not lost, as, it is claimed, would be the result if the upper piece was sewed down at its edges to the under piece. The use of this device by the defendants is denied, and the evidence leaves it at least doubtful. The defendant does stitch the upper strip of insertion to the under strips, but the complainant charges that it is stitched very lightly at the edges, and with the intent that as soon as the garment is laundried the stitches will break, and the overlap, coming loose at the edges, it attains the elasticity which is the purpose of the method described and claimed in patent No. 472,555. There is contradiction between witnesses as to whether, in fact, the edges of defendants' overlap do break away in ordinary washing, and the proofs leave the question of fact so doubtful that I could not base a decree upon it, even if I held the patent valid."

We are of opinion that the complainants have failed to establish a valid technical trade-mark; but, inasmuch as the testimony shows unfair competition, which entitles them to an injunction, it is deemed unnecessary to discuss the distinctions which seem to differentiate this case from one of trade-mark, pure and simple—the foundation prin-

ciple upon which relief is granted being substantially the same and the like remedy invoked.

The defendants should be enjoined from advertising or selling the drawers manufactured by them as "Elastic Seam" or "Stretchy Seam" drawers, from the use of the curved stamp, so nearly imitative of the stamp of the complainants as to be readily mistaken for it, or required, in case they use a curved stamp, to so modify the form of lettering that it would be easily distinguished from complainants', with the addition of words showing that their drawers are not manufactured by Scriven. They should be enjoined from further use of the numeral, "50," on their stamp, and from the use of any insertion at the seam dyed buff or yellow, in imitation of Scriven's. They cannot be enjoined from the use of Egyptian or other yarns for such insertions, the natural color of which may be buff or yellow. The defendants should be required to account for any damages that complainants may have sustained from unfair competition.

The case is remanded, with instructions to modify the decree in accordance with this opinion, and in all other respects it is affirmed.