## Wilson E. Schmick, Trading As Hamburg Broom Works, Appellant, v. West Reading Broom Works et al.

*Equity—Injunction—Unfair competition—Distinctive combination of common characteristics.*

It is unfair competition to so imitate the brooms of another manufacturer by copying his distinctive combinations of colors, bands, sewing and label as to deceive purchasers.  Equity will restrain such unfair competition, by injunction, even though the several distinctive features were not such as, by themselves, could be appropriated to the exclusive benefit of any one manufacturer, where a demand for his particular goods has been established through his own peculiar combination of such common characteristics.

Argued December 6, 1921.  Appeal, No. 263, Oct. T., 1921, by plaintiff, from decree of C. P. Berks Co., Equity Docket, 1919, No. 1252, dismissing bill for injunction, in the case of Wilson E. Schmick, trading as the Hamburg

Broom Works, v. West Reading Broom Works, Inc., John H. Hoffman and Walter Hess. Before Orlady, P. J., Porter, Henderson, Head, Trexler, Keller and Linn, JJ. Reversed.

Bill in equity for injunction to restrain unfair trade competition. Before Wagner, J.

The facts are stated in the opinion of the Superior Court.

The court below dismissed the bill. Plaintiff appealed.

*Errors assigned* were the decree of the court, and various findings and rulings.

*William Kerper Stevens,* for appellant.—No one has a right to sell his goods as the goods of another: Brown et al. v. Seidel et al., 153 Pa. 73; Pa. Central Brewing Co. v. Anthracite Brewing Co., 258 Pa. 45; Bobrow v. Manekin, 59 Pa. Superior Ct. 334.

*C. H. Ruhl,* for appellee.—It is not unlawful to imitate and manufacture and sell as one's own an article which is also manufactured by others: Scranton Stove Works v. Clark et al., 255 Pa. 23; H. J. Heinz et al. v. Lutz Bros., 146 Pa. 592; Hoyt v. Hoyt, 143 Pa. 623.

Opinion by Keller, J., July 13, 1922:

This is a suit to restrain unfair trade competition, and is based on the following facts:

The plaintiff has been a manufacturer of brooms since 1894. He carries on business under the trade name, Hamburg Broom Works. In 1917, he began the manufacture of several brands of distinctive brooms. One, known as "Puritan," has a highly polished or enameled natural color wood handle, and is finished with two bands of white velvet, about three inches apart, inserted in the wire finish to the binder which binds the broom corn to the broom handle, the band near the broom corn being

about five-eighths of an inch wide, and that further away being narrower, about a quarter of an inch wide; the broom is sewed with white cord or thread, four rows to the smaller, No. 6 size, and five to the larger, No. 7; and between the bands of velvet there is attached to the handle, in the process of binding the broom to the wire finish, a white silk or satin label, in which is woven the name of the manufacturer. Another brand, known as "Eclipse," is made just like the "Puritan" brand, except that the bands of velvet are blue and the broom is sewed with blue cord to match, while the silk label is yellow and the name of the brand and of the manufacturer is woven in blue. A third brand, known as "Uncle Tom," has a highly polished or enameled black wood handle, the two bands are of black velvet, the sewing of black cord and the silk label is black, with the name of the brand and of the manufacturer woven in yellow. These brands were distinctive in appearance from those made by any other broom manufacturer, became very popular in the trade, and established an enviable reputation and wide demand for the Hamburg brooms, as they are commonly known.

In 1919, a number of plaintiff's employees withdrew from his service and organized a corporation known as West Reading Broom Works, the corporate defendant. Among them were the defendant, John H. Hoffman, president of the new company, who had been employed by plaintiff for six or seven years as a salesman; Walter Hess, another defendant, who had worked for plaintiff for nineteen years and had been foreman of his plant for over ten years; and A. C. Oberholtzer, secretary, who had worked for plaintiff for nine and a half years and had acted as his office manager and in charge of salesmen.

The new company at once proceeded to manufacture a number of brands of brooms, which were as near like the distinctive brands of the plaintiff, above described, as it was possible to make them, copying them exactly in all

details, except the names of the brand and of the manufacturer on the label. These were named "American Beauty," "Blue Bird" and "Black Beauty" respectively, to correspond with plaintiff's "Puritan," "Eclipse" and "Uncle Tom." Exactly the same colors were used in the velvet bands and the sewing cord, the same number of rows of cord were used in sizes 6 and 7 respectively, and the sizes and widths of the two velvet bands corresponded exactly with those of plaintiff and were spaced the same distance apart. The wire binding was wrapped exactly like plaintiff's with the same spacing between the wires, and No. 6 had one ring or cluster of binding wire beyond the wide velvet band, and No. 7, two, just as in plaintiff's brooms. Highly polished wood handles, natural color and black, were used just like those adopted by plaintiff, and similarly colored silk labels with the names of the brand and of the manufacturer woven therein were attached to the handles, between the velvet bands, in the process of winding the wire finish, just as in plaintiff's brooms. The imitation was so perfect that, as soon as samples of defendants' brooms were shown to a large buyer, he pronounced them "Hamburg" brooms, and without looking closely at the labels, it was impossible to tell the one from the other. One broom salesman was himself deceived until he closely examined the labels. Other witnesses, with long experience in the business, pronounced them identical in appearance, and so they look to the casual purchaser. The conclusion is unavoidable that they were designedly made as near an imitation or duplication of plaintiff's brooms as possible, in order to reap the benefit of his established trade and custom. Defendants' salesmen visited plaintiff's customers, and while they did not attempt to sell their goods as of plaintiff's manufacture, they called attention to their plainly apparent likeness to plaintiff's brooms, naming the corresponding brands, and offered them at a lower price. While so far as the direct testimony showed, they did not attempt to deceive the dealers, it would be

an easy matter for the dealers to deceive the public by substituting defendants' brooms for plaintiff's line, and such was clearly the defendants' purpose and intent.

The court below found that other broom makers used polished handles, velvet or cloth bands, wire finish and sewing cord of various colors in the manufacture of brooms, and held that plaintiff could not appropriate them as distinctive features; he found that plaintiff's label was distinctive, but, as he had not claimed that his label alone was distinctive, held that it could not be "attached to other features in common use and the whole appropriated under the guise of a distinctive scheme," and dismissed the bill.

We are, under the facts in the case, unable to agree with the learned court's conclusion. While polished and colored handles, wire binding and finish, velvet or cloth bands, and sewing cord of various colors had been used by other broom manufacturers, none of them used them all, or in combination, of the form, size, color and arrangement adopted by the plaintiff, which, in conjunction with his distinctive labels, made his several brands of brooms different in appearance and distinguished them from other makes, so that even at a distance, without examining the label, one familiar with them could pick them out as the product of plaintiff's manufacture.

These identifying features were not required in the process of manufacture and, taken together or in combination, produced a characteristic form or appearance, similar to a distinguishing package or container used for bulk goods, which differentiated plaintiff's brands from those of other makers and gave them, in consequence, an enviable popularity in the trade and with the public.

We can see no substantial difference in principle between this case and that of Penna. Central Brewing Co. v. Anthracite Beer Co., 258 Pa. 45, where the defendant was enjoined from coloring the bands on beer barrels in imitation of the color bands used by plaintiff for many years. For years, brewers all over the country have

painted the bands on, and chimes of, beer kegs with various colors to distinguish their particular make of beer, and the plaintiff in that case did not originate the idea, but it adopted a distinctive manner of painting its barrels with a red band at one end and a blue band at the other, which was well known in the trade and community, and thus distinguished them from its competitors', and the defendant was enjoined from marking its barrels with the distinctive colored bands adopted by the plaintiff.

That a number of details of appearance, none of which singly could be exclusively adopted by a manufacturer may be combined or collocated so as specially to identify and distinguish his product from his rivals' and be entitled to protection by courts of equity from unfair competition is settled by a wealth of authority in other jurisdictions. "The most universal element may be appropriated as the specific mark of a plaintiff's goods, if it is used and claimed only in connection with a sufficiently complex combination of other things": New England Awl & Needle Co. v. Marlboro Awl & Needle Co., 168 Mass. 154, 46 N. E. 386. "A court of equity will not allow a man to palm off his goods as those of another whether his misrepresentations are made by word of mouth or more subtly by simulating the collocation of details of appearance by which the consuming public has come to recognize the product of his competitor": Enterprise Mfg. Co. v. Landers et al., 131 Fed. 240 (C. C. A.). "While no one can have a trade-mark monopoly in color of paper or shape of label, in color of ink or in one or another detail, a general collocation of such details will be protected against an imitation the natural result of which is to deceive purchasers, and which must, therefore, be presumed to have been adopted for that purpose": Lalance & Grosjean Mfg. Co. v. National Enameling & Stamping Co., 109 Fed. 317. "They (defendants) had the right to use the background used by the complainant, they had the right to use the clipped corners

and the word "seal," they had the right to use any color that the complainant used for cartons, and they had the right to use packages of the size used by complainant. But when they used all these things in combination, the object is too apparent to admit of argument": National Biscuit Co. v. Ohio Baking Co., 127 Fed. 160. In George G. Fox Co. v. Glynn, 191 Mass. 344, 78 N. E. 89, the defendant imitated the manufacture of plaintiff's "Cream-Malt" bread in the size, shape, and condition of surface of the loaf and by the use of the name "Crown-Malt," and was restrained from such imitation of combined details; and in George G. Fox Co. v. Hathaway, 199 Mass. 99, 85 N. E. 417, an injunction was issued against a combination of the like imitative devices without the name, it being a combination of details such as "no one else needed to use." In American Waltham Watch Co. v. U. S. Watch Co., 173 Mass. 85, 53 N. E. 141, the court said: "A color in combination with a sufficiently complex combination of other things may be recognized as saying so circumstantially that the defendant's goods are the plaintiff's as to pass the injunction line." "Where for the purpose of presenting his goods to the public a manufacturer has adopted a particular combination of features in part old and in part new, he may be entitled to protection against a palpable imitation": Hildreth v. D. C. McDonald Co., 164 Mass. 16, 41 N. E. 56. See also Garrett v. Garrett, 78 Fed. 472, (C. C. A.); Sterling Remedy Co. v. Spermine Medical Co., 112 Fed. 1000 (C. C. A.); Globe-Wernicke Co. v. Brown, 121 Fed. 90 (C. C. A.).

The principle upon which the courts proceed is that it is unfair trade competition for a manufacturer to adopt a mode of conduct, the natural and probable effect of which is to deceive the public, so as to pass off the goods or business of one person for that of another. A manufacturer has no right so to dress up his product or enclose it in a package so like that of a rival manufacturer as to deceive a purchaser or enable a dealer to do so: Penna. Central Brewing Co. v. Anthracite Beer Co., supra, p.

50; Johnson & Johnson v. Seabury & Johnson, 69 N. J. Eq. 696, 61 Atl. 5; Buck's Stove & Range Co. v. Kiechle, 76 Fed. 758; Bauer v. La Societe Anonyme, etc., 120 Fed. 74 (C. C. A.); McLean v. Fleming, 96 U. S. 245, 254; Lawrence Mfg. Co. v. Tennessee Mfg. Co., 138 U. S. 537, 549.

In Juan F. Portuondo Cigar Manufacturing Co. v. Vicente Portuondo Cigar Manufacturing Co., 222 Pa. 116, the present Chief Justice, then on the Common Pleas bench of Philadelphia County, granted an injunction against the defendant because of "a studied effort on the part of Vicente Portuondo to imitate the markings, labels and general method of dressing his goods that had been pursued by Juan F. Portuondo and thereby to profit on the magic that had already been given to the name of Portuondo by his brother," holding it to be such unfair trade competition as to entitle the plaintiff to relief; and his action in that respect was upheld by the Supreme Court.

It is not necessary that it be shown that the public has actually been deceived by the imitation, but only that it has a tendency to deceive. The gist of the action is the intent to get an unfair benefit from another's trade: Shaw & Co. v. Pilling & Son, 175 Pa. 78. Though a manufacturer does not himself deceive the dealers, he will be enjoined if he knowingly puts it in the power of dealers to deceive the public: New England Awl & Needle Co. v. Marlboro Awl & Needle Co., supra; George G. Fox Co. v. Glynn, supra; N. K. Fairbank Co. v. Bell Mfg. Co., 77 Fed. 869 (C. C. A.); Royal Baking Powder Co. v. Royal, 122 Fed. 337 (C. C. A.); Scriven v. North, 134 Fed. 366 (C. C. A.); Garrett v. Garrett, supra.

The rule was well stated by the late Mr. Justice MITCHELL, in his dissenting opinion in Brown v. Seidel, 153 Pa. 60—though held by the majority of the court not to be applicable to the facts in that case, as not showing an imitation, or intent on the part of the defendant to sell his goods as those of the plaintiff (p. 72)—He said:

"Where the imitation is with intent to acquire, wrongfully and in an underhand manner, a portion of another's good will or business, equity will enjoin the attempt as a fraud, though the imitation be not of a legal trade-mark. And such intent may be gathered from imitation of name, descriptive words used, size or style of package, color or shape or mode of application of label, general appearance, or any circumstances which afford basis for the inference of an intent to copy, and where such intent is thus indicated, the actual resemblance need not be so close as to deceive any but the most careless buyers. It is enjoined not as a deception of the public likely to be successful, but as an attempt to defraud the plaintiff. Any rule short of this is a premium on dishonesty, and an invitation to a commercial policy which measures its actions not by conscience or right, but by ingenuity in dodging the law" (p. 74).

In Scranton Stove Works v. Clark, 255 Pa. 23, Mr. Justice FRAZER discriminatingly reviewed the pertinent decisions and, following the Portuondo case, declared the general rule to be "that anything done by a rival in the same business by imitation or otherwise, designed or calculated to mislead the public in the belief that in buying the product, offered by him for sale, they were buying the product of another's manufacture, would be in fraud on that other's rights and would afford just ground for equitable interference"; and it was held that, while the defendants could not be enjoined from making stove parts of the same size and shape as the plaintiff's they would be restrained from using any marks, initials, abbreviations, etc., whether registered or not, adopted by plaintiff and used by it as an effective means of identifying the articles and products of plaintiff's works, on the ground that defendants' use of them was calculated to deceive the ordinary purchaser into believing they were manufactured by plaintiff. See, also, Bobrow v. Manekin, 59 Pa. Superior Ct. 334; Hires Co. v. Hires, 182 Pa. 346.

In the very late case of B. V. D. Co. v. Kaufmann & Baer Co., 272 Pa. 240, the general subject of unfair trade competition was reviewed by Mr. Justice KEPHART. He said (p. 242): "Unfair competition, embracing an infringement of a trade-mark, may be said to be distinguishable in law from the latter in that it does not necessarily involve the question of the exclusive rights of another to the use of a name, symbol or device. The gist of the offense seems to be whether the act done tends to pass off the goods of one for those of another, or to deprive such other of his rights; and the basis of the action is fraud or deceit, misleading the public in the purchase of goods......The test, so far as the defendant is concerned, is whether the thing done was calculated to deceive an intending ordinary purchaser, not necessarily an intelligent one, in that the goods sold were not those of the manufacture called for. The true theory is the protection of the public, whose rights are infringed or jeopardized by confusion of the goods produced by unfair methods of trade,—as well as the owner's right to be protected from such methods." In that case, an injunction was sought restraining a dealer from selling and offering for sale, as B. V. D. underwear, garments made by some other manufacturer and bearing some other label or mark. The language applies equally as well to a manufacturer who, with deliberate intent, imitates and combines the labels, designs and devices, adopted by a rival manufacturer to identify his goods, so exactly and in such detail that a dealer buying his goods would be able to palm them off upon an ordinary customer as those of his rival in business.

We think the allegations of the bill are sufficiently broad to cover a combination or collective use of all the imitation devices used by the defendants in the manufacture of their product. The fifth, sixth, seventh and ninth assignments of error are sustained. The decree of the court below is reversed, the bill is reinstated, and it is ordered that a decree be entered enjoining the defend-

ants, and every of them, from manufacturing or selling any brooms made by them containing highly polished wood handles, natural color or black, velvet bands in white, blue and black colors, similarly colored sewing cord, woven silk or satin labels fastened in the wire finish to the binder, or other identifying marks and devices, in such combination or manner as to form an imitation of the distinctively marked brooms manufactured by the plaintiff, known as "Puritan," "Eclipse" and "Uncle Tom" brands respectively. All costs to be paid by the appellees.